IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 6, 2010

### IN RE: APRIL P-C, JENNIFER P-C, AND KENNETH P-C

**Appeal from the Juvenile Court for Rutherford County**
**No. TC1054     Donna Scott Davenport, Judge**

_____

**No. M2010-00043-COA-R3-PT - Filed August 26, 2010**

_____

Father appeals the termination of his parental rights to three children, asserting that the findings of the juvenile court that he had abandoned his children by failure to support and that the conditions which led to the children's removal persisted were not supported by clear and convincing evidence. Father also asserts that the court erred in finding that the termination of his parental rights was in the best interests of his children. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., and ANDY D. BENNETT, J.J., joined.

Thomas H. Castelli, Murfreesboro, Tennessee, for the appellant, Ray C.

Robert E. Cooper, Jr., Attorney General and Reporter, and Lauren S. Lamberth, Assistant Attorney General; and Susan H. Hubbard, Murfreesboro, Tennessee, for the appellee, the Tennessee Department of Children's Services.

### OPINION

### I. Factual and Procedural Background

This appeal involves the termination of parental rights to three children, April P-C, Jennifer P-C, and Kenneth P-C, who initially came into custody of the Department of Children's Services ("DCS") on June 5, 2007, pursuant to a Protective Custody Order entered in the Juvenile Court for Rutherford County. DCS had filed a Petition to have the children declared dependent and neglected based on a referral from a physician expressing concerns for the health of the children. The record of the dependent and neglect proceeding reveals that the mother of the children took Kenneth, who was born January 19, 2007, to a hospital emergency room on April 3, 2007, after noticing that he was lethargic, blue, and cold to the touch; the other two children, ages two and three, were with her during the hospital stay.

Kenneth had been admitted to the hospital several times previously and, at this admission, was diagnosed with "non organic failure to thrive"[1] and admitted for treatment. After determining the cause of Kenneth's weight loss to be gastroesophageal reflux, appropriate treatment was undertaken to increase his weight and he was released on April 5 with instructions on the measures to be taken to continue his weight gain.

On April 11, Dr. Johnson, Kenneth's pediatrician, saw him for a routine check-up. Dr. Johnson was concerned that Kenneth had suffered weight loss since his discharge on April 5 and discussed the matter with Mother, who advised Dr. Johnson that she had also taken Kenneth to the emergency room between April 5 and April 11 because he had been spitting up formula. Dr. Johnson changed the ratio of milk to formula for Kenneth and told Mother to bring him back in the next few days and that, if Kenneth had not gained weight, Kenneth would be admitted to the hospital. Dr. Johnson also posted in his treatment notes that he intended to call DCS "if I had to."

Mother returned Kenneth to Dr. Johnson's office on April 13, at which time Kenneth had gained weight but had a malnourished appearance. Dr. Johnson started Kenneth on medication for his gastroesophageal reflux and began to monitor his weight weekly. Dr. Johnson testified that, although he was concerned about the care Kenneth was receiving he delayed calling DCS in order to "give the parents every chance I could." Dr. Johnson made a referral to DCS on May 30, 2007. When asked why he made the referral to DCS, Dr. Johnson stated:

> Well, a lot of things had changed. He had been admitted to Vanderbilt and had shown weight gain at Vanderbilt; he had been admitted to Middle Tennessee Medical Center and had shown weight gain. But every time he had gone back home, there was a problem with his weight gain. He would gain a little -- maybe lose a little; gain a little.

DCS filed a petition to have the children declared dependent and neglected on June 5, 2007; the petition also sought temporary custody of the children. In the Affidavit of Reasonable Efforts filed in support of the petition, Shannon Kozimor, DCS Family Service Worker, identified Kenneth's medical condition and history as well as the fact that Mother had multiple cases with DCS involving her other children as specific risks necessitating removal. The affidavit also detailed efforts DCS had made to secure services to the family. Following a hearing the court entered a Protective Custody Order, granting DCS temporary custody of the three children. The court also entered an order finding probable cause to believe the children were dependent and neglected, appointing a guardian *ad litem* for them, appointing counsel for the parents and setting a further hearing on ratification of the permanency plan for July 3.

---

[1]His diagnosis was "non organic failure to thrive" because it was characterized by weight loss caused by his social situation rather than any medical condition. He weighed 7 pounds and 2 ounces when born on January 19, 2007, and weighed only 9 pounds on April 29.

The initial permanency plan listed actions for the parents to take in order to achieve the desired outcome of either reunification or placement with a relative, including: a parental assessment; development of a plan for transportation to get children to medical appointments; anger and stress management; and drug and alcohol counseling for the father. Because he had tested positive for drugs, he was not allowed visitation with the children; the plan required him to submit to drug testing with visitation being restricted until he had a negative drug screen history. Both parents received an explanation of the plan and signed it on June 25, 2007; the plan was approved by the court on August 1, 2007.

A revised permanency plan was drafted on January 17, 2008. This plan retained the desired outcomes in the existing plan, included further actions for the parents to take in order to regain custody of their children and required on-going parent-child bonding and attachment assessments. Under this plan, Father was allowed supervised visitation with his children as long as he continued to test negative for drugs and attend at least three AA or NA meetings each week. The court approved this plan on May 22, 2008.

DCS drafted another permanency plan at a child and family team meeting on March 31, 2008. Under this plan, in addition to the requirements of the previous plans, the parents were required to maintain a stable income and to develop a budget. This plan also listed adoption as an outcome since no relative had been identified as a possible guardian. Though both parents signed this permanency plan, they objected to the possibility of adoption.[2] This plan was approved by the court on June 5, 2008.

On August 29, 2008, a fourth permanency plan was drafted by DCS. Substantively, this plan was similar to the previous plans, however, the plan noted that the parents continued to make only minimal progress despite the services being offered to them by DCS and that they were still unable to demonstrate their ability to care for the children independently. Both parents signed this permanency plan; even though it also contained a provision for the possibility of adoption, neither parent objected as they had with the third permanency plan. The court approved this plan on November 11, 2008.

Following hearings on October 29 and November 26, the court entered a Dispositional Order, *inter alia,* noting progress the parents were making in improving their parenting skills and allowing the parents to have unsupervised weekly visitation from 10:00 a.m. on Wednesday to 1:00 p.m. Friday beginning December 3. This order also contained a provision prohibiting visitors other than DCS, providers of DCS services, the guardian *ad litem* and representatives of CASA from being at the house when the children were present. On February 11, 2009, after noting that the parents had substantially complied with the permanency plans, DCS filed a Motion for a Trial Home Pass which would have placed the children in the parents' home for ninety days. DCS withdrew this motion, however, after a

---

[2]Under Section 10: Agreements and Signatures, both parents responded "No or NA" when asked if they agreed with the Permanency Plan. In the box to explain No or NA answers, both parents wrote "Do not agree with adoption."

Child Protective Services Investigator conducted a surprise inspection during an unsupervised visit and discovered a barefoot man hiding in the girls' closet on February 19, 2009.

On February 23, 2009, DCS met with the parents to discuss the violation of the Dispositional Order; at this time, a fifth permanency plan was drafted. The plan listed several reasons why the children were still unable to leave DCS custody including: that the parents continued to make decisions that put their children at risk; that the parents were not demonstrating the skills or ability to care for their children independently; that the parents depended on an inconsistent income and budgeted poorly; and that the parents intentionally violated court orders. Reunification was still listed on this plan as a possible outcome, however, DCS acknowledged that once parental rights were terminated, adoption would be the sole outcome desired.[3] Both parents signed this plan and the court approved it on May 8, 2009.

On April 7, 2009, DCS filed a petition to terminate the parental rights of Mother, Father, Wayne D., and the Unknown Father of April P-C[4] to all three children, on the grounds of abandonment by failure to support, abandonment by failure to provide a suitable home, persistence of conditions, and failure to comply with the permanency plans. DCS also contended that the termination of parental rights was in the best interests of all three children.

After a trial held on August 12, 2009, August 14, 2009, September 23, 2009, and October 9, 2009, the court terminated the parental rights of Mother and Father on the grounds of abandonment by failure to support and persistence of conditions, finding also that the termination of parental rights was in the best interest of the children.[5]

Father appeals the order terminating his parental rights, raising the following issues:

> 1. Whether the juvenile court erred in finding the grounds for termination of the Father's parental rights were supported by clear and convincing evidence and
> 2. Whether the juvenile court erred in finding, by clear and convincing evidence that the termination of the Father's parental rights was in the best interests of the children.

---

[3]This was noted in the handwritten Child and Family Team Meeting Summary notes.

[4]April P-C's paternity is unknown, but Wayne D. was believed to be a possible father. Father signed a Voluntary Acknowledgment of Paternity as to April making him her legal father. Both Jennifer and Kenneth were born during Father's marriage to Mother and their paternity is not an issue.

[5]The parental rights of Wayne D. and the Unknown Father of April P-C were terminated on the grounds of failure to establish and exercise paternity and are not at issue in this appeal.

## II. Standard of Review

The Supreme Court held in *Stanley v. Illinois*, 405 U.S. 645, 651 (1972), that parents have the fundamental right to the care, custody, and control of their children. Parental rights, however, are not absolute and can be terminated by clear and convincing evidence that termination is justified. *Santosky v. Kramer*, 455 U.S. 745, 748 (1982). Termination of parental rights must be premised on the best interests of the child in question. *Tennessee Department of Human Services v. Riley*, 689 A.W.2d 164, 169 (Tenn. Ct. App. 1984).

As a threshold matter, there must be proof that a least one statutorily defined ground for termination exists. Tenn. Code Ann. § 36-1-113(c)(1). Because the termination of parental rights makes the relationship between parent and child nonexistent, a higher standard of proof is required. The petitioner must prove a basis for the termination of parental rights by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c). A "clear and convincing" standard requires that the truthfulness of the facts asserted be highly probable, eliminating any substantial doubt. *In Re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). After a ground for termination has been established by clear and convincing evidence, the court must then determine whether termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2)*; Riley*, 689 A.W.2d 164, 169. Clear and convincing evidence is also required to establish that termination is in the best interest of the child. *In re Valentine*, 79 S.W.3d 539, 549 (Tenn. 2002).

On appeal, findings of fact by the trial court are reviewed *de novo* and carry a presumption of correctness, unless the preponderance of the evidence suggests otherwise. Tenn. R. App. P. 13(d). In a parental termination case, the preponderance of the evidence must show that there is clear and convincing evidence of a ground for termination and that termination is in the best interests of the child. *In Re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004).

## III. DISCUSSION

### A. Abandonment by Failure to Support

Father contends that DCS did not provide clear and convincing evidence that he abandoned his children by failing to support them. Father does not argue that he paid support as ordered, but, rather, asserts that he supported the children by purchasing of food, clothing, and furniture during their visits.

A court may terminate parental rights when abandonment, as defined by Tenn. Code Ann. § 36-1-102, has occurred. Tenn. Code Ann. § 36-1-113(g)(1). A child is abandoned when:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child.

Tenn. Code Ann. § 36-1-102(I)(A)(i).

Under this statute, "willful failure to support" is failing to make monetary support or failure to provide more than token payments toward the support of a child during a period of four consecutive months. Tenn. Code Ann. § 36-1-102(1)(D). Failure to support is "willful" when a person, who knows of his or her duty to support and has the capacity to do so, makes no attempt to pay support and is unable to provide justifiable excuse for not doing so. *In re M.J.B.*, 140 S.W.3d at 654. Support is deemed to be "token" when it is insignificant given the individual parents' means. Tenn. Code Ann. § 36-1-102(1)(B). Furthermore, the occasional gifts of food or clothing cannot substitute for support. *In re J.D.C.*, No. E2007-02371-COA-R3-PT, 2008 WL 1899987, at *12 (Tenn. Ct. App. Apr. 30, 2008).

The petition for the termination of parental rights was filed on April 7, 2009; therefore, the relevant four-month period began on December 7, 2008. Father had been ordered to pay twenty-five dollars per week in support of his children since the entry of the order approving the first permanency plan on August 1, 2007. In addition, Father acknowledged his responsibility to comply with all court orders by signing the permanency plan on June 25, 2007. At the time he signed the initial permanency plan, Father was also presented with a copy of the Criteria and Procedure for Termination of Parental Rights which stated that willful failure to make child support payments would justify the termination of his parental rights.

At trial, Father acknowledged that he did not make support payments as required by the court's order; he also testified that "while he was working, he was making enough sufficiently to take care of himself and the kids" but that he put child support payments "on the back burner so I can actually try to make money and do everything I can." There is no proof that Father tried, at any time, to make the payments. The evidence is clear that his failure to make support payments in accordance with the order was willful.

Father contends that, even though he did not make regular child support payments, he supported his children by providing them with food, clothes, and shelter during visitations. This type of expenditure, however, is not a substitute for the monetary support required by the statute. Furthermore, this court has previously held that providing meals and like activities do not constitute support, but rather only serve the purpose of facilitating visitation. *In re J.D.C.*, No. E2007-02371-COA-R3-PT, 2008 WL 1899987, at *12 (Tenn. Ct. App. Apr. 30, 2008).

**B. Persistence of Conditions**

Father appeals the finding of clear and convincing evidence that the conditions which led to the removal of his children persisted. Father argues that the juvenile court failed to acknowledge the efforts he made to comply with all that was asked of him.

Tenn. Code Ann. § 36-1-113(g)(3) allows for the termination of parental rights on the grounds of persistent conditions if:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

A showing of clear and convincing evidence of every factor is needed in order to terminate parental rights on the grounds of persistent conditions. *In re Valentine*, 79 S.W.3d at 549.

When DCS filed the petition for the termination of parental rights, the children had been in custody for twenty-two months pursuant to court order. DCS initially sought removal of the children because the parents did not demonstrate the necessary skills to care for the children or their medical and emotional needs. DCS then provided Father with numerous services to improve his parenting skills, including counseling to provide him with the skills necessary to be a successful parent and bonding and attachment sessions to facilitate a closer relationship between Father and children. In addition, Father was ordered to attend medical appointments for the children in order for him to understand their special medical needs.

Evidence that Father continued to lack appropriate parenting skills included his own testimony in which he admitted occasionally sleeping in the car during parental counseling sessions as well as testimony from the expert who conducted the bonding and attachment assessments that Father seemed more interested in the computer or television than his children during these sessions. Though Father argues that he made progress, he testified that conditions had not changed enough for him to regain custody of his children. Further, there was no proof to support a finding of a likelihood that the conditions which led to the

children's removal would be soon remedied.  Father was given sufficient time and assistance to address the challenges these children faced.[6]  While Father admittedly made some progress, the evidence supports a clear finding that the conditions which led to the children's removal persisted.

### C. Best Interests of the Children

Once a ground for termination has been established, the court must make the determination that termination of parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(I) outlines a non-exhaustive list of considerations when making this decision:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

---

[6] Indeed, in its order terminating parental rights, the court recognized the long delay between the grant of temporary custody, the order declaring the children to be dependent and neglected and the order of termination.  The court acknowledged that the delay was a consequence of the court's belief that with more services the parents would eventually demonstrate safer and appropriate parenting skills, a belief the court characterized as "mistaken."

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The statute does not require that every one of these factors be present before a court can make the determination that termination of parental rights is in the child's best interests. *State of Tennessee Dep't of Children's Servs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002).

The juvenile court found first that the parents failed to make lasting adjustments in order to make their home safe for their children, even after reasonable efforts were made by DCS to aid the parents in doing so. The court next found that the parents failed to maintain a meaningful relationship with their children or support their children financially while they were in DCS custody. The court examined the lasting effect that the continuation of parental rights would have on the children, taking into consideration the length of time the children had been in DCS custody and that there was a family wanting to adopt them. Taking all these factors into consideration, the court found that termination of parental rights was in the best interests of the children in order for them to be successfully integrated into a safe, stable, and permanent home with their foster parents. We have reviewed the record and it fully supports the determination that termination was in the best interest of the children.

**IV. Conclusion**

For the foregoing reasons, the judgment terminating Father's parental rights is AFFIRMED.

_____
RICHARD H. DINKINS, JUDGE